IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNA MODICA, | : | |
|         Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MAPLE MEADOWS HOMEOWNERS | : | No. 13-0036 |
| ASSOCIATION et al., | : | |
|         Defendants. | : | |

**M E M O R A N D U M**

PRATTER, J.                                                                                                    JANUARY 31st, 2014

Anna Modica claims that she broke her ankle when she fell on a patch of black ice on Defendant Maple Meadows Homeowners Association's ("Maple Meadows") parking lot. She sued, arguing that Maple Meadows breached its duty to keep the parking lot safe. Maple Meadows has moved for summary judgment ("MSJ," Docket No. 24). The Court, writing solely for the benefit of the parties, will grant the Motion.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

According to Ms. Modica's version of the information developed during discovery:

At some point between 2:30 and 3:00 AM on January 4, 2011, Ms. Modica slipped and fell on a patch of black ice, apparently four or five feet across, in Maple Meadows' parking lot in Conshohocken, Pennsylvania. She was visiting her daughter at her daughter's condominium in the Maple Meadows development. According to Ms. Modica, as she had walked from her car to the edge of the parking lot, she had been looking down for ice, but she did not see the ice until after she fell; nor had she observed any patches of ice in the parking lot earlier that day or the

1

day before, although she had walked through the parking lot some four hours earlier that very night, i.e., at around 10:30 PM on January 3. A witness who inspected the area after the fall did not see any salt, and photographs taken two evenings after the fall show the existence of a black ice patch at the location of Ms. Modica's fall.

There is no dispute that it had snowed just over a foot approximately a week before the incident, from December 26 to December 27, and that thereafter the only additional precipitation was 0.04 inches of rain on January 2. After the snowfall, CLC Landscapes, Inc. ("CLC"), pursuant to a longstanding oral contract with Maple Meadows, plowed the snow to the sides of the parking lot and up onto the curbs and grassy areas surrounding it, and then applied salt. These snow piles remained up to a foot high, according to Ms. Modica, at the time of her fall. CLC never returned to inspect the site or resalt, and Maple Meadows never affirmatively asked it to. Following the December 26-27 snowfall, temperatures fluctuated from highs of up to 52 degrees Fahrenheit on January 2 and 3, with highs above freezing every day between December 28 and the incident, and with lows below freezing each of those days save for January 2. As indicated by measurements taken at Philadelphia International Airport—which the Court notices to be over ten miles away from Conshohocken—the temperature was 37 degrees at 3:54 PM on January 3; had dropped to 30 degrees by 7:54 PM; and continued to decline to 26 degrees by 1:54 AM on January 4, soon before Ms. Modica fell between 2:30 and 3:00 AM. Resp. (Docket No. 25), Ex. 4, at 2 (Docket No. 25-4).

Gerald Ciaffone, Maple Meadows' president and corporate designee, testified during his deposition that he knew generally that the snow pushed up against the perimeter of the parking lot would melt "[o]n a hot day" and that it would refreeze once temperatures dropped again, he "guess[ed,] by 3:00 in the morning." Resp. at 12 (quoting Gerald Ciaffone Dep. 61:5–13 (MSJ

2

Ex. F (Docket No. 24-10))). Nicole Ciaffone, Mr. Ciaffone's daughter-in-law (and Ms. Modica's daughter), also opined that "sometimes at night, [the water on the lot] refreezes when it's really cold so it's all over, [in] little spots" of ice. Resp. at 13-14 (quoting Nicole Ciaffone Dep. 17:14–18 (MSJ Ex. O (Docket No. 24-19))). Her husband, Mr. Ciaffone's son, testified that he discussed with his father, Mr. Ciaffone, "the fact that [he (the son)] did feel the parking lot was dangerous from time to time when it snowed," but that neither Mr. Ciaffone nor Maple Meadows took any action outside of adhering to Maple Meadows' oral contract with CLC pursuant to which CLC would plow and salt the area after a snowfall. Resp. at 13 (quoting Nicholas Ciaffone Dep. 9:9–23 (MSJ Ex. J (Docket No. 24-14))).

## II.     SUMMARY JUDGMENT STANDARD

Upon motion of a party, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment has the initial burden of supporting its motion by reference to admissible evidence showing the absence of a genuine dispute of a material fact or showing that there is insufficient admissible evidence to support the fact. *Id.* 56(c). Once this burden has been met, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

Summary judgment should be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir.1988). A fact is

"material" if it could affect the outcome of the suit, given the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The court must not weigh the evidence or make credibility determinations. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). Nevertheless, the party opposing summary judgment must support each essential element of his or her opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Of course, the court may grant summary judgment if the plaintiff's version of the facts, as a matter of law, does not entitle her to relief: "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

**III. DISCUSSION**

Maple Meadows moves for summary judgment on two bases: the so-called "hills and ridges" doctrine and its lack of notice, either actual or constructive, of the ice upon which Ms. Modica allegedly fell. The hills and ridges argument, which Ms. Modica spends most of her

Response addressing, is easily rejected as not determinative of the pending Motion,[1] but the notice argument, to which she responds in less detail, is not. Even as the nonmovant, Ms. Modica has not carried her burden to articulate or identify evidence that Maple Meadows had notice of the ice upon which she asserts she fell. Once Maple Meadows, in its present Motion for Summary Judgment, has pointed to evidence that it had no actual or constructive notice of the ice, Ms. Modica must then "rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings [or] legal memoranda." *Berckeley Inv. Grp.*, 455 F.3d at 201. But those parts of the record to which Ms. Modica points amount to mere conjecture and rhetorical supposition which "could not lead a rational trier of fact to find for [her]," *Matsushita*, 475 U.S. at 587, because she cannot establish that Maple Meadows had actual or constructive notice of the ice upon which she allegedly fell. The Motion for Summary Judgment must therefore be granted.

Guidance for the decision here may be found in *Tameru v. W-Franklin, L.P.*, No. 07-1965, 2008 WL 4272637 (E.D. Pa. Sept. 11, 2008), *aff'd*, 350 F. App'x 737 (3d Cir. 2009), in which this Court, affirmed by the Third Circuit Court of Appeals, addressed a situation quite similar to the one now pending. In that case, Ms. Tameru had slipped and fallen on a patch of ice just outside the defendant Wyndham Franklin Plaza Hotel at around 10:30 PM. She knew of the

---

[1] The "hills and ridges" doctrine applies "only in cases where the snow and ice complained of are the result of an *entirely natural accumulation*, following a recent snowfall." *Harvey v. Rouse Chamberlin, Ltd.*, 901 A.2d 523, 526 (Pa. Super. Ct. 2006) (quoting *Backsick v. Barnes*, 341 A.2d 157, 160 (Pa. Super. Ct. 1975) (emphasis in *Harvey*)). It does not apply where "the condition of the land was influenced by human intervention," such as where, given a defendant's "interaction with the *snow via* plowing, the *ice* . . . could not have been 'the result of an *entirely natural* accumulation.'" *Id.* at 527; *see also Casey v. City of Philadelphia*, 93 A.2d 470, 472 (1953) ("When the law distinguishes between natural and artificial accumulations it refers to that accumulation due to a universal fall of snow followed by a universal freeze, as against the freezing of a small localized spot which a property-owner allows to be created and to exist as the result of some inaction on his part.").

wintry conditions, having recently observed snow piled on the sides of the nearby parking garage at which she worked, but she did not see the ice upon which she fell. At 9:17 PM, about an hour and fifteen minutes before the accident, a hotel security guard examined the precise area in which she was to fall and did not see any icy or dangerous conditions. *Id.* at *1-3. Further, the hotel's director of security testified that he had never before seen icy conditions in the area of the fall, although he was aware "that pedestrians sometimes track water and snow into that area." *Id.* at *3. He "also acknowledged that at certain temperatures water will turn to black ice." *Id.*

The hotel moved for summary judgment. Under section 343 of the *Restatement (Second) of Torts*, this Court explained, the hotel's duty was not absolute, but rather arose only upon "*notice* of a dangerous or defective condition"—whether that notice was actual or constructive. *Id.* at *4 (emphasis added) (discussing *Restatement (Second) of Torts* § 343 and citing cases). To withstand summary judgment, Ms. Tameru bore the burden of producing

> evidence which proves that the property owner deviated in some way from his duty of reasonable care under the circumstances. In order to do so, [Ms. Tameru] must prove that the Hotel had notice of the hazardous condition by showing that [the hotel] knew, or in the exercise of reasonable care should have known, of the existence of the harmful condition. Mr. and Mrs. Tameru have introduced no evidence that the Hotel had any *actual notice* of the alleged hazardous condition outside the Hotel, so they must demonstrate that an issue of material fact remains as to whether the Hotel had *constructive notice* of the hazard, that is, whether the Hotel should have known of the hazardous condition. In order to find the Hotel had constructive notice, Mr. and Mrs. Tameru must present some evidence that would allow a jury to reasonably infer that a hazardous condition was present for a reasonable amount of time to allow for discovery of the condition.

*Id.* (emphases added) (citations and internal quotation marks omitted). In attempting to meet this burden, Ms. Tameru adduced, in pertinent part, that the hotel security guard testified that the area of the fall was wet and that pedestrians were tracking water into the hotel lobby (and thus that the area of the fall, immediately outside the lobby, must also have been wet). *Id.* at *5. Further, her meteorological expert opined that while the temperature before 8:00 PM was above freezing, that

by 8:00 PM it had reached freezing and that the temperature had continued to fall to 30º F by the time Ms. Tameru fell at around 10:30 PM. *Id.*

The Court held that the evidence to which Ms. Tameru pointed was insufficient to meet her burden. *Id.* at *6. The Court rejected Ms. Tameru's argument that the hotel's knowledge of water in the area of the fall, combined with "prevailing weather conditions," meant that the hotel had actual notice of a dangerous condition or that constructive notice of such a condition could be imputed to it, and, further, her argument that "'[t]he temperature was such that any prudent person would have taken steps to salt the wet area realizing it would be freezing.'" *Id.* (quoting the Tamerus' Response brief).

> While this evidence possibly could show a general expectation of the potential for ice to be in the area, that expectation, if one existed, is not sufficient evidence from which a fact-finder could reasonably infer that black ice where Mrs. Tameru fell was present in the Hotel's entryway or had been present for a sufficient period of time to provide the Hotel with constructive notice of a hazardous condition. The Hotel presented uncontroverted evidence that Mr. Brown inspected the area of the fall at 9:17 p.m., approximately 1 hour and 15 minutes before Mrs. Tameru fell and roughly the same amount of time after the air temperature in the general area allegedly reached the freezing point. Although Mr. Brown noted that it was cold outside, Plaintiffs have produced no evidence to indicate that he was aware of the exact temperature or that he had any knowledge that the sidewalk outside the Hotel door was freezing (if indeed it was) or could freeze. Rather, Mr. Herman, director of security of the Hotel, testified at deposition that he had never seen ice in the area where Mrs. Tameru fell, an area protected by a large overhang.

*Id.* (citation omitted). Because Ms. Tameru could not show a genuine dispute of material fact as to whether the hotel had actual or constructive notice of the hazardous condition, the Court granted the hotel's motion for summary judgment. *Id.* at *7.

The Third Circuit Court of Appeals affirmed. 350 F. App'x 737. It agreed that Ms. Tameru had not produced evidence adequate to defeat summary judgment even though "[n]o salt had been applied to the area where Mrs. Tameru fell"; and even though the hotel's security head "admitted that 'black ice' may form if water drops below a certain temperature"; and, finally,

7

even though Ms. Tameru's meteorologist reported "that the weather conditions at the time of Mrs. Tameru's fall were 'consistent' with the 'presence of black ice'" such that the area identified by the guard as being wet "'would have been icy based on the prevailing weather conditions.'" *Id.* at 738-39 (emphasis omitted) (quoting the expert's report). The Court of Appeals explained:

> Without any evidence that the ice was observable for any significant period of time prior to the accident, a jury may not reasonably infer that the hotel had constructive notice of the hazardous condition. Even when the "general weather conditions" are such that a hazardous condition may materialize, constructive notice cannot be inferred from this mere possibility. *Weather conditions can only support an inference of actual or constructive notice of a hazardous condition when coupled with evidence that the defendant had knowledge of both the weather condition at the time of the accident and the fact that the weather condition created hazards on the premises*.

*Id.* at 740 (emphasis added) (citing cases; citations omitted). And under that standard, the Court of Appeals instructed,

> [t]he evidence does not support a reasonable inference of actual or constructive notice . . . . Viewed in the light most favorable to plaintiffs, the most the evidence establishes is that the temperature had fallen enough for ice to form in the area near the hotel and that, by the time of Mrs. Tameru's fall, ice had in fact formed. None of the evidence indicates that the defendant knew or should have known that ice had actually formed in the entryway to the hotel at the time the accident occurred. The security manager testified that he had never before observed ice in the covered entryway area, and plaintiffs did not produce any evidence suggesting that the hotel should have been aware that icy conditions developed in this area. During the routine security sweep of the premises conducted at 9:17 p.m., the security guard spot-checked the entryway area and did not detect any ice. The mere fact that the temperature had dropped to 31 degrees by 10:00 p.m. does not support a reasonable inference that the hotel should have known that ice had formed in the location where Mrs. Tameru fell. Likewise, Mrs. Tameru's observation of ice on the ground after she fell does not support a reasonable inference that the hotel knew, or should have known, about the ice prior to her fall. Despite the meteorological evidence that the temperature had fallen below freezing in the hours before the accident, there was no evidence that ice had existed for any length of time before Mrs. Tameru observed it. Because plaintiffs failed to produce evidence of actual or constructive notice, the district court properly granted summary judgment for the defendant.

*Id.* at 740-41.

In the present case, rather than meeting the dictates of *Tameru*, Ms. Modica simply argues that under section 343 of the *Restatement (Second) of Torts*, Maple Meadows

> knew or should have known of the that [sic] ice would form in the lot which needed to be dealt with in order to avoid a dangerous situation. black [sic] ice was historically prevalent after CLC plowed the lot and was actually present in patches in the parking lot during the week leading up to Plaintiff's slip and fall. It was a condition known to [Maple Meadows'] president and corporate designee and [Maple Meadows] never resalted the lot or called CLC to come back out.

Resp. at 29.

The Court sees no legally relevant difference between *Tameru* and the instant case. Lest Ms. Modica claim that *Tameru* is distinguishable because, in that case, "[t]he Hotel's director of security testified that he had never seen ice in the area where Mrs. Tameru fell and was not aware of ice ever forming in the Hotel's entryway," 2008 WL 4272637, at *5, the Court notes that despite Mr. Ciaffone's apparent acknowledgement that winter can produce dangerous parking lot conditions, there has been no admission on the part of Mr. Ciaffone or Maple Meadows that either had actually ever seen ice in the particular area of Ms. Modica's fall, *see Tameru*, 350 F. App'x at 738-39.

The evidence to which Ms. Modica points, construed, even as it has been, in her favor, does not support her argument that the black ice upon which Ms. Modica allegedly slipped was "known" to Maple Meadows, in the person of Mr. Ciaffone or otherwise. Ms. Modica's claim of actual knowledge cannot be sustained. For one, even if Maple Meadows "actually knew that there were snow piles," Resp. at 27, as *Tameru* makes clear, the actual knowledge required is *of the dangerous condition itself*, not of conditions which, following certain weather possibilities, *might lead to* a dangerous condition. That is why an employee's observation in *Tameru* that the ground was wet did not mean that the hotel also knew there was ice present. The same can be said with regard to the Maple Meadows site.

9

Second, Ms. Modica's remaining "actual notice" arguments conflate the actual notice and constructive notice standards, neither of which her evidence meets. The fact that ice was "actually present," in the words of Ms. Modica's counsel, Resp. at 29 (even if there was evidence of its actual presence, which, according to the record presented to the Court, is certainly not as sustained by the record as Ms. Modica would here have the Court accept), does not mean that Maple Meadows *actually knew* of that ice. Nor can Ms. Modica succeed in establishing actual notice by claiming that Maple Meadows knew there were snow piles and knew "that these snow piles would melt and refreeze causing dangerous conditions in the middle of the night." Resp. at 27. Such an argument may only be made under the rubric of constructive knowledge.

There are two methods of establishing constructive notice. Under the first, the plaintiff must produce evidence that the dangerous condition existed *long enough* such that, but for the exercise of *reasonable* diligence, the defendant would have discovered it. The question under this first prong is not one of knowledge, but of actual timing. Alternatively, under the second option, the plaintiff must, in addition to showing that the hazardous condition–producing weather was occurring, tender evidence that "the defendant had knowledge of both [(a)] the weather condition at the time of the accident and [(b)] the fact that the weather condition created hazards on the premises." *Tameru*, 350 F. App'x at 740.

Ms. Modica cannot proceed under the first method because she has produced no evidence as to when ice in fact formed. To the contrary, Ms. Modica had been out earlier on the day before her fall, and returned just hours before the accident, at around 10:30 PM, and she testified that she did not notice any areas of ice in the parking lot. Resp. at 17, 19. The weather data itself does not provide sufficient indication as to when—or if—ice formed. The parties' temperature data—taken at Philadelphia International Airport, Resp., Ex. 4, which is, it must be noted, some ten or

more miles away from Conshohocken, where the accident occurred—indicates that the temperature fell from 34 ºF to 30 ºF at some point between 6:54 PM and 7:54 PM, and that it only slowly descended—at the airport—thereafter to 26 ºF at 1:54 AM (before rising to 27 ºF by 3:54 AM and up through and past freezing by 9:54 AM). There were no "extreme temperatures or winds" (in fact, the wind speed at the airport ranged from only 3 to 7 mph during this timespan, Resp. Ex. 4, at 2), but rather temperatures close to the freezing point. *See Tameru*, 2008 WL 2008 WL 4272637, at *6 n.6. No evidence was presented on the physical issue of the relationship of time, temperature, and quantity or depth or layout of water, or of any chemical or other existing surface treatment of the parking lot, to persuade the Court that even if there had or could have been melting and refreezing, that such changes likely occurred. In other words, how long at what temperature(s) must what amount of snow, in which locations, be exposed in order to melt, in which quantities, to result in such an amount (how much?) of water on the asphalt in question, such that that water, later exposed to sufficiently decreased temperatures (how low?) for sufficient amounts of time (how long?), could result in the ice patch on which Ms. Modica allegedly slipped? And what would all of these weather and physical conditions have to be so as to create such ice existing for a sufficient duration so as to put Maple Meadows on constructive notice?

In short, "[d]espite the meteorological evidence that the temperature had fallen below freezing in the hours before the accident, there was no evidence that ice had existed for any length of time before" Ms. Modica fell on it. *Tameru*, 350 F. App'x at 740-41; *see also, e.g.*, *Beck v. Holly Tree Homeowners Ass'n*, 689 F. Supp. 2d 756, 768 (E.D. Pa. 2010) ("Without any evidence that the black ice was observable for any significant period of time prior to the accident, a jury cannot reasonably infer that Defendants had constructive notice of the hazardous

condition."). And without evidence of when—or if—ice actually formed on the spot on which she fell, Ms. Modica cannot show that the ice was there long enough to put Maple Meadows on constructive notice.

Ms. Modica's only remaining option, then, is to proceed under the second prong of the constructive notice inquiry. But she fails here, too, because she can show neither that Maple Meadows *actually knew* of "the weather condition *at the time of the accident*" or that it actually knew that such a "weather condition created hazards on the premises." *Tameru*, 350 F. App'x at 740 (emphasis added). Despite Ms. Modica's attempt to characterize Mr. Ciaffone's testimony as admitting that he "actually knew . . . that these snow piles would melt and refreeze causing dangerous conditions in the middle of the night," Resp. at 27, all Mr. Ciaffone in fact said was that snow plowed to the perimeter of the parking lot could melt "on a hot day" and that he "guess[ed that] by 3:00 in the morning" water "would [freeze]" if the temperatures fell below freezing. Resp. at 28 (quoting Gerald Ciaffone Dep. 61:5–13). Notwithstanding what Ms. Modica would hope to make of it, this purported "admission" is no more than the recognition of someone who has lived in this part of the globe (or otherwise paid attention in science class) that water, when exposed to sufficient temperatures over sufficient times, undergoes phase changes. Mr. Ciaffone's statement does not, by contrast, suggest either that he (a) actually knew of the temperatures *at the time of the accident*—i.e., that night, rather than in response to Ms. Modica's counsel's hypothetical questions at his deposition—or (b) knew that the actual temperatures would create ice on the particular spot upon which Ms. Modica fell.

Again, *Tameru* makes clear that "[e]ven when the 'general weather conditions' are such that a hazardous condition may materialize, constructive notice cannot be inferred from this mere possibility." 350 F. App'x at 740. The fact that the weather conditions may be "'consistent' with

the 'presence of black ice'" does not mean that a defendant is on constructive notice that there is such ice. *Id.* at 738-39 (emphasis omitted) (quoting expert's report). This Court, too, rejected the argument "that general weather conditions in the area can impute notice of a problem in a very *specific* location," 2008 WL 4272637, at *6 (emphasis added), which, here, would be the spot upon which Ms. Modica fell. That Mr. Ciaffone's son told Mr. Ciaffone that he felt that "the parking lot was dangerous from time to time when it snowed," Resp. at 29 (quoting Nicholas Ciaffone Dep. 9:9–23), does not lead to any reasonable inference that Mr. Ciaffone knew that the particular area in which Ms. Modica fell experienced black ice under certain weather conditions. It is clear that the knowledge has to be more particularized—if *X* weather condition occurs, then soon after, *Y* harmful condition will occur at *Z* location. If no particularity were required, this prong of the constructive notice test would hardly be a requirement at all "in view of the climatic conditions in this hemisphere." *Harvey v. Rouse Chamberlin, Ltd.*, 901 A.2d 523, 526 (Pa. Super. Ct. 2006) (citation omitted) (discussing the hills and ridges doctrine).

Finally, although Ms. Modica does not say so explicitly, what really seems to be lurking in her argument is the notion that Maple Meadows should not be able to escape liability when it had failed to inspect the parking lot in the days after CLC initially plowed and salted it. This failure-to-inspect theory would seem to be the only way to distinguish *Tameru*, in which the hotel staff inspected the particular area in which the fall occurred over an hour before the accident but saw no ice. But such a theory is not viable under the facts of this case, and thus *Tameru* cannot be distinguished based on such a theory, because such a theory is incompatible with the conceptual underpinnings of the constructive notice doctrine.

In fact, under the governing case law, such a theory would be tautological and would permit an end run on the general means of establishing constructive notice. To say that Maple

Meadows had constructive notice because it would have seen ice if it had inspected, and therefore, that it should have inspected, for if it had, it would have had notice, is entirely circular reasoning. A defendant's duty to inspect is subject to a reasonableness standard that in turn informs the inquiry of whether the defendant has constructive notice. Constructive notice is an indirect means for imposing a duty to take reasonable steps to prevent foreseeable harm— constructive notice arises from, but does not impose, the duty to inspect. *Cf. Parker v. McCrory Stores Corp.*, 101 A.2d 377, 378 (Pa. 1954) ("There was no evidence, apart from the description of general weather conditions, how long the wet and slushy condition of the entryway had existed; no evidence that defendant had taken any measures or no measures to correct it. For all we know, an employee may have mopped it up two minutes before Mrs. Sheridan fell." (alteration omitted) (quoting *Sheridan v. Horn & Hardart Baking Co.*, 366 Pa. 485, 487, 77 A.2d 362, 363 (1951)). Constructive notice does not itself mean that a landowner has a perpetual and constant duty to inspect at every moment. Indeed, the lack of such a duty of omniscience is precisely why constructive notice exists, and why it may only be found where the hazardous condition has existed for a sufficient period of time—i.e., why, put another way, "[w]ithout any evidence that the ice was observable *for any significant period of time* prior to the accident, a jury *may not* reasonably infer that the hotel had constructive notice of the hazardous condition." *Tameru*, 350 F. App'x at 740 (emphasis added).

The point is that without probative evidence of when a dangerous condition developed— that is, in cases like these, when the ice formed—the plaintiff, as a matter of law, cannot show that the defendant would have discovered the condition *even if* it had inspected. *See, e.g.*, *Craig v. Franklin Mills Assocs., L.P.*, 555 F. Supp. 2d 547, 550 (E.D. Pa. 2008) ("The duration of the hazard is important because if a hazard only existed for a very short period of time before

14

causing any injury, then the possessor of the land, even 'by the exercise of reasonable care,' would not discover the hazard, and thus would owe no duty to protect invitees from such a hazard." (quoting *Restatement (Second) of Torts* § 343)), *aff'd sub nom. Craig v. Mills Corp.*, 350 F. App'x 714 (3d Cir. 2009). Without evidence that the ice existed for a sufficient period of time—and, as discussed, here there is no such adequate physical or meteorological evidence—a jury cannot say that a reasonable defendant inspecting his land, as often as reasonable, would thereby have noticed the hazardous condition. "Pennsylvania courts commonly treat a plaintiff's failure to provide evidence of timing as dispositive." *Larkin v. Super Fresh Food Mkts., Inc.*, 291 F. App'x 483, 485 (3d Cir. 2008).

The failure to inspect, therefore, is not relevant. Indeed, it is this "even if" logic that characterizes the concept of constructive notice: to fixate on the fact that the hotel staff in *Tameru did* inspect would be to misunderstand the concept. Actual inspection speaks either to *actual notice* or to one of the predicates for constructive notice (disproving that the ice existed at a certain time), but not to whether a defendant had a duty to inspect. Neither this Court's decision in *Tameru*, nor the Third Circuit Court of Appeals' affirmance, depended on the inspections per se, but rather referred to the inspections primarily to establish that the ice upon which Ms. Tameru fell had not yet formed an hour and fifteen minutes prior to her fall, and therefore, *based on that timing*, that the hotel lacked constructive notice.[2]

---

[2] At least one court has apparently ignored this distinction and, without fully parsing *Tameru*, reversed the proper relationship of, or otherwise conflated, the concepts of constructive notice and the duty to inspect. *E.g.*, *Gervasio v. Chelsea Pocono Fin., LLC*, No. 10-2430, 2013 WL 5603575, at *5 (M.D. Pa. Oct. 10, 2013) ("[T]he [*Tameru*] court granted the motion for summary judgment, *basing its decision on the adequacy of the inspections* and the lack of any observation of ice at the location any time before this incident, including the inspection one hour and fifteen minutes prior." (emphasis added)). Others have been clearer in applying the logic used by the Court of Appeals in *Tameru*. *E.g.*, *Mills v. Sears, Roebuck & Co.*, No. 97-3282, 1998 WL 229571, at *2 (E.D. Pa. Apr. 28, 1998) ("[T]he statement attributed to a Sears employee

Here, accordingly, in the absence of sufficient evidence to show when the ice—*not the water*—actually formed, Ms. Modica cannot show that Maple Meadows would have found the ice upon which she claims she fell *even if* it had inspected. It thus is to no avail to argue that Mr. Ciaffone (as to whom there is no evidence he knew in the middle of the night, either, that there had been melting *and* that temperatures actually were falling, thereby causing freezing and risking ice formation) should have had people checking the lot between 10:30 PM (when Ms. Modica last was on the lot, and saw no ice) and 2:30 or 3:00 AM (when she fell). *Cf. also Parker*, 101 A.2d at 378 ("No Court has ever held that five minutes is sufficient constructive notice of a dangerous condition; to so hold would be to make the defendant an insurer. If that were the law, then every time it rained or snowed the owner of a large department store would have to employ a great many extra people for the sole purpose of inspecting every minute or every five minutes . . . .").

Ms. Modica has failed to produce evidence showing that Maple Meadows had actual or constructive knowledge of the ice upon which she says she fell. Maple Meadows' Motion for Summary Judgment must be granted.

**CONCLUSION**

Maple Meadows' Motion for Summary Judgment (Docket No. 24) is granted.

An Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

concerning the monitoring of outside entrances generally is not evidence of the amount of time the hazardous condition existed which the Mills allege caused Mrs. Mills' injuries.")